UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

JONATHAN D. HUTCHINS AND
SARAH P. HUTCHINS, individually and
on behalf of all others similarly situated,

        Plaintiffs,

v.

SERVICE FINANCE COMPANY, LLC,

        Defendant.

Case No.:

CLASS REPRESENTATION

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiffs, Jonathan D. Hutchins and Sarah P. Hutchins ("the Hutchins"), individually and on behalf of the other members of the Classes defined below, file this class action complaint against Defendant Service Finance Company, LLC ("Service Finance"), and allege:

### I.  Introduction.

1.  This is an action for violations of the Truth in Lending Act, 15 U.S.C. § 1640; deceptive and unfair trade practices laws; fraudulent inducement; and civil conspiracy in connection with misrepresentations and fraudulent omissions in the solicitation of consumer loans for the purchase of residential solar energy systems.

2.  Defendant Service Finance is a finance company that regularly extends or offers to extend consumer credit to consumers.

3.  Service Finance orchestrated a scheme with solar installers to induce homeowners into entering finance agreements for the purchase of solar energy

systems with false and fraudulent representations and omissions that the finance agreements were subject to low financing costs, such as a "low" annual percentage rate ("APR").

4.     However, the financing costs associated with these deals are deceptive, false, and misleading. Service Finance purposefully designed the deals so that a substantial finance charge was baked into the cash price of the goods and services. This finance charge was created and mandated by Service Finance—not the solar installers—and amounted to nearly 30% of the true cash value of the goods and services.

5.     Each finance agreement issued by Service Finance for the purchase of a solar energy system included a stated "cash price" on the face of the financing agreement that was false because it included the nearly 30% financing fee set by Service Finance.

6.     These finance agreements are created by Service Finance and provided to the solar installers to use in sales for which Service Finance will be providing credit. Service Finance sets the rate of the fees and requires the solar installers to use their form contract in order for Service Finance to finance the sale.

7.     Service Finance goes to great lengths to keep the fee and the true cash price of the energy systems a secret by instructing the solar installers not to disclose the financing fee and not to disclose the true cash price of the systems.

8. Had the financing fee and true cash price been properly disclosed, the APRs provided in the finance agreements would have been closer to, if not exceeding, 30%.

9. Plaintiffs are consumers who entered loans with Service Finance under the false pretense that the loans were offered at cash value with a low APR.

**II.   Parties, jurisdiction, and venue.**

10. The Hutchins are citizens of Washington who financed a solar energy system through Service Finance Co. for their home located in Lacey, Washington.

11. Service Finance Company, LLC, is a Florida limited liability company with its headquarters in Boca Raton, Florida. All members of the LLC are citizens of Boca Raton, Florida.

12. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs allege federal claims against Defendants under the Truth in Lending Act.

13. The Court has diversity jurisdiction over the state law claims raised pursuant to 28 U.S.C. § 1332(d) because at least one Class Member is of diverse citizenship from one Defendants, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000.00 exclusive of costs and interest.

14. This Court has personal jurisdiction over Defendant because Service Finance Company is a Florida limited liability company and is subject to general jurisdiction here.

15.     Venue is appropriate in this district under 28 U.S.C. § 1391(b)(1) because this is where the Defendant resides.

**III.    Service Finance's predatory and unlawful business practices.**

16.     Service Finance describes itself as a "nationally licensed finance company offering more than 70 different loan programs," including "many specialty loans serving the Solar and Commercial markets."

17.     Service Finance uses predatory and unlawful business practices to induce homeowners into entering finance agreements for the purchase of solar energy systems.

18.     The finance agreements issued by Service Finance for solar energy systems use standardized language that is uniform for all finance agreements issued by Service Finance within the relevant time period.

19.     Service Finance is a finance company which has created digital applications to enable rapid loan applications and approvals to facilitate high-pressure solar sales. In this role, Service Finance has built an incredibly lucrative business by employing a variety of predatory and unlawful business practices, as detailed further below.

20.     Upon information and belief, Service Finance has engaged in the predatory business practices detailed below since at least 2015 and has not remedied or modified its misconduct to date. The predatory and unlawful business practices described herein are based on the uniform business practices of Service Finance.

4

### A. *Service Finance provides solar loans through its various online and mobile platforms.*

21.    Service Finance is a "Finance Partner" to solar sales companies—meaning that it has entered into agreements with those companies to facilitate fast, ready to access financing for expensive solar systems.

22.    Service Finance serves this role because it is a so-called "fintech" (short for "financial technology") company which has developed online and mobile applications that can be quickly accessed by a salesperson to enable rapid solar loan applications and acceptance.

23.    A solar installer working with Service Finance must become a "registered dealer" with Service Finance by undergoing the company's Dealer Enrollment Process.

24.    The Dealer Enrolment Process comprises training and onboarding which the dealer must complete before they can offer Service Finance solar loans.

25.    Once a solar installer completes the Dealer Enrollment Process, they obtain access to the Service Finance Dealer Portal, which enables the installer's salespersons to apply for "loans" in the consumer's name.

26.    Service Finance's training materials make it clear that the solar installers that use their Dealer Portal do not extend credit themselves. Instead, the installers simply certify that a project has been completed and then "get paid" by Service Finance. Service Finance is the only company which extends credit during

the transaction, which is a key selling point the company touts in its training and promotional materials to solar installers.

27.     The solar companies that Service Finance partners with engage in high-pressure sales tactics, effectuated by door-to-door salespeople.

28.     Pursuant to this business model, the salesperson approaches a consumer's home uninvited and attempts to get them to sign a deal for solar that very same day. They employ high-pressure tactics to secure a signature that same day because it's well known within the industry that, the more time a consumer has to think about a transaction, research a company, and discuss options with neighbors and friends, the less likely that consumer is to go through with the deal.

29.     Through its Dealer Enrollment Process and other training programs and instructional materials, Service Finance enables and instructs solar salespeople to help consumers quickly apply for credit during the first sales visit. Service Finance's software is designed to streamline this process, allowing the salesperson to apply for credit in the homeowner's name by simply inputting name, contact information, loan product, and loan amount into the salesperson's tablet or similar device.

30.     More specifically, Service Finance streamlines its loan application process through its EZ Sign process, which can be accessed via the Service Finance mobile applications and allows Service Finance to collect signatures directly from salespersons' mobile devices:

*EZ Sign Documents*, available at https://www.youtube.com/watch?v=H2zvHpNl4io&list=PLflucXpDtCm6iHSFUyPp9UNtaMtGqc-Vl&index=3 (April 1, 2022).

31.    The door-to-door sales approach is heavily dependent upon the use of small, difficult-to-read tablets, which the salesperson uses to obtain customer signatures. The homeowner is often not told that their signature would be transposed onto a written contract, and the homeowner is not given the opportunity to review the terms of a written contract.

32.    The expediency of the transaction is dependent upon quick and easy financing being made available to the customer. This is the pivotal role Service Finance plays in the door-to-door solar fraud scheme. Indeed, Service Finance emphasizes the expediency of its "EZ Sign" process in its training and promotional materials, describing the process as providing "Simple Document Signing – Just 4 Clicks!" the "instant the loan is approved":



*EZ           Sign           Documents,           available           at* https://www.youtube.com/watch?v=H2zvHpNl4io&list=PLflucXpDtCm6iHSFUyPp9UNtaMtGqc-Vl&index=3 (April 1, 2022).

33.    The "4 Clicks" referenced in the training materials include the entering "the loan number" and the last four digits of the homeowner's social security number:



*EZ           Sign           Documents,           available           at* https://www.youtube.com/watch?v=H2zvHpNl4io&list=PLflucXpDtCm6iHSFUyPp9UNtaMtGqc-Vl&index=3 (April 1, 2022).

34.    The sales representative then confirms other details, including the consumer's name, the property address, sale price, loan amount, and loan program.

35.    Service Finance has entered into contractual relationships with solar companies that enable those companies to use Service Finance's software and provide Service Finance credit arrangements to customers, including through the Dealer Enrollment Process.

36.    Pursuant to those relationships, Service Finance provides training, guidelines, and requirements for the solar salespeople, which solar companies are required to follow.

37.    Service Finance further incentivizes salespeople to push Service Finance financing agreements to consumers by providing substantial prizes to those salespeople that meet certain loan sale thresholds. Such prizes include gift cards and electronic devices.

38.    The solar salespeople are authorized by Service Finance to solicit financing and to bind homeowners to financing agreements with Service Finance. To that end, the salespeople represent to homeowners that they are authorized to act on behalf of Service Finance.

39.    Service Finance controls over the way its financing agreements are presented to solar customers through both its fintech software platform the salespeople use to generate quotes at the customer's home, as well as through the

agreements and business relationships that Service Finance separately maintains with the solar companies.

### B. Service Finance prepares the TILA disclosure and, in doing so, conceals a massive finance charge.

40.    When a solar installer closes a deal that will be financed by Service Finance, they must use the applications created by Service Finance. As a result, Service Finance dictates the language used on the contract and the amounts included for disclosures, including the "Cash Price," the "Amount Financed," the "Finance Charge," and the "APR."

41.    To be clear: Service Finance, through its Dealer Portal, online and mobile applications, and EZ Sign process, prepares the TILA disclosures. The solar installer does not provide any TILA disclosures; that process is handled by Service Finance through its applications. The solar installer simply follows the training and requirements imposed by Service Finance as a condition of using the Dealer Portal and online/mobile applications, including by inputting the Cash Price as being inclusive of the undisclosed finance charge Service Finance requires be imposed in order to access Service Finance solar loans, as detailed further below.

42.    In its training and promotional materials, Service Finance admits that it prepares and issues what it describes as a "Loan Package Delivery," which includes the TILA disclosures shown on the finance agreements.

43.    The contracts between Service Finance and its installer partners provide that Service Finance will provide financing to consumers in exchange for

a financing fee charged to the consumer. Service Finance sets the amount of the fee, which is set forth in a rate sheet shared between Service Finance and its solar partners.

44.     It works like this: the door-to-door salespeople obtain a signature of a homeowner that is used to bind the homeowner to a financing agreement from Service Finance.

45.     The contract used is created by Service Finance via the online and mobile applications described above. While the contract is set up to look like a retail installment contract between the solar installer and the homeowner, it is effectively a contract between the consumer and Service Finance. And, indeed, Service Finance describes the contracts as "loans" issued by Service Finances in its training and promotional materials provided to solar installers.

46.     Once signed by the homeowner on the salesperson's tablet and the system is installed, Service Finance pays the solar installer for the "Purchase Price" of the instrument, which is defined in Service Finance's dealer agreements as the original "face amount" of the agreement "less the applicable Dealer Fee" set forth in the rate sheet.

47.     The "Dealer Fee" is a fee imposed into the contract as a cost of financing. The finance fee (or Dealer Fee) is never disclosed to the homeowner.

48.     The contracts all include a stated "Cash Price." The cash price stated in the contracts is the "Purchase Price"—or the true cost of the goods and services—***plus*** the Dealer Fee imposed into the deals by Service Finance.

49.     Indeed, the solar installers increase the cash price of the solar energy systems specifically to cover the cost of Service Finance's Dealer Fee.

50.     Thus, the "Cash Price" in each finance agreement issued by Service Finance is false and misleading.

51.     According to the contracts, the homeowner agrees to pay the stated "Cash Price" in the agreement, plus the stated APR, "according to the payment schedule shown in the Truth-in-Lending Disclosure." The payment schedule states that the first payment is due "[m]onthly, beginning 30 days after the contract is purchased by Service Finance."

52.     The solar installer does not require a down payment, and no payments are owed at all under the contract until 30 days after Service Finance purchases the contract. All payments are paid directly to Service Finance, who is the entity to whom payments are initially owed under the terms of the written contracts. Consumers are never obligated to make payments to the solar installer under these financing agreements because payments are not owed until Service Finance completes the deal by paying the solar installer the true cash value of the systems.

53.     The contracts between Service Finance and its solar installers specifically state that the solar installers are not to accept payments of any kind from the buyers.

54.     In fact, the contracts between Service Finance and its solar Dealers set forth a procedure for if and when Service Finance opts to not fund the deal. In those instances, the solar Dealer is required to repurchase the finance agreement

from Service Finance. According to that procedure, Payments are never owed to the solar Dealer until after the contracts are repurchased and restructured.

55.    The fact that the solar installer does not have to issue any form of credit is a primary selling point, which Service Finance makes in its training and promotional materials it issues to solar installers. In those materials, Service Finance makes it clear that the solar installer simply needs to have the consumer complete an application and "EZ Sign the Finance Agreement," then, once the job is installed, the installer simply "gets paid."

56.    Upon information and belief, the finance fee charged to consumers for financing solar energy systems can amount to or even exceed 30% of the true cost of the energy system. If the financing fee had been properly disclosed and accounted for, the true APR of the deals would amount to or exceed 30%, exceeding even the rates of high-interest credit cards.

57.    As a result of this financing structure, the interest collected by Service Finance from the solar loans is not its primary profit source; instead, the primary profit source is the hefty, undisclosed financing fee. As such, Service Finance provides very minimal baseline qualification standards (including a minimum credit score and home ownership) for its loans such that most homeowners will qualify.

58.    After the first 18 months, the financing contracts re-amortize, resulting in significantly increased payment amounts after the first 18 months. The ballooning nature of the payment obligations is not explained to the customer.

59.     More fundamentally, however, the sales pitch and loan terms do not disclose the fact that the amount financed includes not just the cost of the system, but also the large Dealer Fee which can total more than 30% of the amount financed.

60.     The finance charge is not identified in the Service Finance fintech generated quote provided to consumers as part of the solar proposal. Instead, consumers are left with the impression that the loan principal goes entirely towards the hardware and installation costs of the system.

61.     Service Finance takes great steps to keep its contractual terms with solar companies, including the rate sheet, hidden from consumers.

62.     Pursuant to its agreements and business relationships, Service Finance instructs its solar company partners and their salespeople to not disclose the Dealer Fee or the true "cash price" of the solar system, as doing so might enable the consumer to deduce the existence of the huge undisclosed finance charge.

### C.     Misrepresentations as to energy offsets and tax "rebates."

63.     To induce the customer to enter into the deal, Service Finance's sales agents promise that the consumer will no longer have to pay an electrical bill because the solar system will completely offset their energy usage.

64.     This is very rarely true; instead, consumers wind up with two bills: one to the electrical company and another to Service Finance.

65.     Similarly, Service Finance's sales agents routinely mischaracterize the federal Investment Tax Credit ("ITC") as a "rebate" entitling the consumer to a check from the government. The ITC is no such thing; instead, it's simply a credit to be offset against tax liability.

66.     Many solar customers do not have the tax liability necessary to fully benefit from the ITC. And, even if they do qualify for a tax write-off, the ITC is not a rebate and does not entitle the homeowner to a check from the government.

67.     At all relevant times, Service Finance knew of and encouraged its sales agents' misrepresentations as to energy savings and tax "rebates" because these tactics resulted in far more loans being applied for and issued than a more honest sales practice would have achieved.

68.     Indeed, upon information and belief, Service Finance provided sales tactics and tips to its sales agents in order to increase the number of loans issued, including training regarding energy offsets and tax "credits."

69.     The sales agents' formulaic pitch centers around the notion that the low APRs will result in inexpensive monthly payments. However, the APRs are "low" only because Service Finance misclassifies the hidden finance fee as included in the cash price. If the finance fee was properly identified as a cost of finance, the APR would be unusually high.

70.     The so-called "low" monthly payments are also significantly increased after the initial 18 months of the loan. The ballooning nature of the payments is not explained to homeowners before their signatures are collected, and

homeowners are not provided an opportunity to review the written terms and disclosures on the loan agreements.

71. In short: Service Finance's profits depend upon a high volume of solar energy sales. Recognizing this interest, Service Finance partners with sales companies and instructs sales agents to misrepresent energy offsets and tax rebates—and then touts supposed "low APRs" as being more cost efficient than a traditional electricity bill. In reality, however, the entire formulaic sales pitch is false, deceptive, and conceals the fact that the consumers will be saddled with two bills instead of one, with the second bill to Service Finance bearing the weight of a hefty, undisclosed dealer fee.

> **D.** **Federal regulators, consumer advocacy groups, and others have recognized that the exact types of business practices Service Finance engages in are abusive, predatory, and illegal.**

72. As discussed above, Solar Finance engages in a variety of predatory and unlawful business practices, including:

a. Charging an undisclosed financing fee and misleading consumers into thinking that the principle of the loan goes entirely towards the solar energy system and installation costs, instead of the reality, which is that up to 30% of the financed transaction is actually a dealer fee windfall going to Service Finance;

b. Instructing and enabling its sales agents to misrepresent the amount of energy savings that the power systems will provide to induce those individuals to enter into the predatory loans;

c. Instructing and enabling its sales agents to misrepresent the nature, effect, and availability of the ITC and similar government programs as affording "rebates" or "checks" from the government in order to induce consumers to enter into the predatory loans;

d. Entrapping consumers into its predatory loans which feature ballooning payments where a substantial prepayment (which is supposed to be covered by the touted tax "rebates") is not able to be made within a short window of time;

e. Failing to provide required disclosures, including TILA disclosures, as alleged further below; and

f. Targeting elderly, low-income, minority, and non-English speaking consumers with its predatory business practices.

73.    Federal regulators, state attorneys general, consumer advocacy groups, and others have recognized these practices as abusive, predatory, and illegal.

74.    The Consumer Finance Protection Bureau ("CFPB") recently issued a report highlighting the abuse and predatory nature of the types of business practices Service Finance engages in, explaining:

The CFPB found that the rapid rise of nonbank lenders partnered with solar salespeople into the solar market is also raising the potential for illegal behavior and consumer harm. In contrast to auto loans or mortgages where consumers know they want a car or house and then seek out financing options, door-to-door salespeople are going directly to homeowners in attempts to convince them both to purchase a solar energy system and to do so via a loan through their company. Within this sales and lending scheme, many homeowners are discovering they are being duped and misled into contracts with inflated principals, ballooning monthly payments, and electricity savings lower than promised.

*CFPB Report Finds Lenders Cramming Markup Fees and Confusing Terms into Solar Energy Loans*, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-report-finds-lenders-cramming-markup-fees-and-confusing-terms-into-solar-energy-loans/ (Aug. 7, 2024).

75.     Further, "the CFPB has identified four areas of significant risks," which are:

- **Hidden markup fees:** Lenders build hidden fees into their loans by marking up the principals of the loans. These "dealer fees" often increase the loan cost by 30% or more above the cash price of a solar project. Lenders frequently bake these fees into a loan's principal without including them in the stated annual percentage rate (APR). Lenders also rarely and clearly separate these markups from the total cash price that consumers would otherwise pay for a system's installation.

- **Misleading claims about what consumers will pay**: While receiving a tax credit is not guaranteed and based on a number of factors, many solar loan sales pitches promote the 30% federal "Investment Tax Credit" for residential solar installations. In fact, lenders will present loan principals as a "net cost" that assume the tax credit will be received. Consumers may end up believing either the tax credit will subtract from the "net cost" or that the "net cost" is what will be paid regardless of whether they end up qualifying for and receiving the tax credit.

- **Ballooning monthly payments**: Loan terms may require a substantial prepayment by a certain date that is equal to the expected tax credit. If a homeowner does not qualify for the tax

credit, they will end up on the hook for the prepayment or face substantially higher monthly payments.

- **Exaggerated savings claims**: Homeowners report being told that solar panels will cover financing costs as well as eliminate future energy bills. While this promise may be true for some homeowners, the financial benefits of solar projects are uncertain and can vary significantly by geographic location and season.

*Id.*

76.    Similarly, the Center for Responsible Lending ("CRL") recently published a report entitled "The Shady Side of Solar System Financing," observing that:

A critical problem is that typically the price of the solar system is substantially inflated if a consumer finances a system. For solar panels that would cost $20,000 if purchased outright with cash, the price of the panels is increased to $25,000 or more if there is financing. This increase is considered a dealer's fee. This practice enables door-to-door sellers to falsely represent to borrowers that they are getting low-cost financing by having contracts include a low nominal payment rate, while, in fact, most of the financing cost is hidden in the inflated price of the solar panel system. The financing company retains this markup—the difference between the inflated amount of the loan and the true price of the product—for its profit. This profit amount depends on the agreement between each installer and finance company. This amount is not revealed to the homeowner, and installers are often forbidden from disclosing this markup.

CRL, *The Shady Side of Solar System Financing*, available at www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-shady-side-solar-financing-jul2024.pdf (July 2024).

77.    The CRL identified several other areas of concern, ultimately concluding:

Current residential solar energy sales, financing, and installation providers operate under a business model that profoundly harms consumers. If left unchecked, these harmful practices will undermine

homeowners' long-term investments in green energy and put families at risk of spending $15,000 or  more on solar systems that:

> • Fail to deliver promised performance;
>
> • Increase—rather than decrease—homeowners' utility bills; and
>
> • Put consumers at risk of losing their homes.

State Attorneys General, along with other federal and state regulators, must devote more enforcement resources to protect consumers from:

> • Dishonest, predatory, and strong-arm sales tactics, including offering inflated estimates of future  energy or tax savings;
>
> • Hidden dealer fees that substantially increase the cost of systems bought on credit;
>
> • Unscrupulous lender-installer partnerships that lock in their profits at the expense/disadvantage  of the consumer; and
>
> • Shoddy installers who, once paid, move on with no concern regarding whether the systems they  sell are installed properly, permitted, and working as promised.

*Id.*

### IV.    Plaintiffs and the Class were Defrauded by Service Finance

78.    On August 12, 2022, a salesperson with the solar installation company, Smart Energy Today, Inc.,[1] knocked on the front door of the Hutchins' home in Lacey, Washington to solicit a solar energy system.

79.    After the sale presentation, the salesperson had the Hutchins provide their signatures on the salesperson's tablet.  Those signatures were transposed onto a financing agreement with Service Finance. (Exhibit 1).

---

[1] Smart Energy Today, Inc., merged into the solar company Lumio HX.

80.     According to the financing agreement, the Hutchins borrowed $53,360.00, at an annual percentage rate of 2.99%, to be paid back in monthly installments over a 25-year period.

81.     The financing agreement states that the "amount financed" ($53,360.00) was the same as the "cash price" of the goods and services.

82.     However, the true cash price of the goods and services—aka the true "amount financed"—was significantly less than the "amount financed" listed on the agreement because Service Finance included a hidden and undisclosed finance charge in the "amount financed." As a result, the true "APR" is much higher than the APR listed on the agreement.

**V.     The statutes of limitations are tolled.**

83.     Defendant successfully concealed the existence of the finance fee and unlawful sales practices described above from Plaintiffs and the Class by withholding all mention of it in the financing agreements and by colluding with their solar company partners to not disclose same, as alleged in detail above.

84.     The affirmative acts of Defendant alleged herein, including the acts to conceal the existence of the Dealer Fee from Plaintiffs and the Class, were carried out in a manner that evaded detection.

85.     Indeed, Defendant went so far as to prevent solar companies from offering cash prices to prevent Plaintiffs and the Class from independently deducing the existence of the Dealer Fee.

86.    Because the misconduct was both self-concealing and affirmatively concealed by Defendant, Plaintiffs and the Class had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether misconduct existed.

87.    As a result, the statutes of limitations on the claims brought in this case are tolled or delayed in accrual by operation of the delayed discovery doctrine.

88.    The statutes of limitations are additionally tolled or delayed in accrual by application of the doctrines of fraudulent concealment and estoppel because Defendant took direct action to conceal the existence of the dealer fee from Plaintiff and the Class.

## VI.    Class action allegations.

89.    Pursuant to Rules 23(a), 23(b)(2), and 23(b)(3), Plaintiffs bring this action on behalf of themselves and on behalf of a National Class and subclasses, more specifically defined as:

### <u>National Class</u>

All persons in the United States who financed solar energy systems with Service Finance from January 1, 2015, through today.

### <u>Washington Class</u>

All persons in the State of Washington who financed a solar energy system with Service Finance from January 1, 2015, through today.

90.    Unless otherwise stated, the term "Class" refers jointly and severally to the all the Classes and to the Subclasses.

91.    Excluded from the Class are: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; and (c) any person who timely and properly excludes himself or herself from the Class.

92.    **Numerosity—Fed. R. Civ. P. 28(a)(1).** The members of the proposed Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable.

93.    Although the precise number of Class Members is unknown to Plaintiffs, upon information and belief, the Class would easily number in the thousands if not tens of thousands.

94.    **Typicality— Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and the Class all financed solar energy systems through Service Finance and were charged undisclosed dealer fees.

95.    Plaintiffs and the Class were exposed to the same or substantially similar misrepresentations and omissions—namely, concealment of Service Finance's undisclosed fees and other predatory business practices.

96.    Plaintiffs and each Class member suffered economic damages that are calculable on a class-wide basis. The claims all arise from a single course of conduct and each Class member would individually make similar legal and factual arguments to establish Defendant's liability.

97.     **Rule 23(b)(3) Commonality & Predominance—Fed. R. Civ. P. 23(a)(2) & 23(b)(3).** Plaintiffs and the Class are united by a community of interest in obtaining appropriate remedies, including monetary, declaratory, and injunctive relief. This action involves questions of law and fact that are common to the Class that are susceptible to common answers and that predominate over any individual questions specific to any Class member. These include:

    a.  Whether Service Finance failed to properly disclose its dealer fees to Plaintiffs and the Class;

    b.  Whether an ordinary reasonable consumer would have financed through Service Finance had the dealer fee been disclosed;

    c.  Whether the written terms of Service Finance standard financing agreements are misleading and/or fraudulent;

    d.  Whether Plaintiffs and the Class were fraudulently induced into entering financing agreements with Service Finance;

    e.  Whether Service Finance violated the Truth In Lending Act by failing to disclose dealer fees to Plaintiffs and the Class;

    f.  Whether Service Finance violated Florida's Deceptive and Unfair Trade Practices Act by failing to disclose dealer fees to Plaintiffs and the Class;

    g.  Whether Service Finance is liable for common law fraud by failing to disclose dealer fees to Plaintiffs and the Class;

h. Whether Service Finance was unjustly enriched by failing to disclose and then collecting dealer fees from Plaintiffs and the Class;

i. Whether Plaintiffs and the Class are entitled to monetary damages as a result of Service Finance's failure to disclose dealer fees to Plaintiff and the Class;

j. Whether Plaintiffs and the Class are entitled to declaratory and equitable relief as a result of Service Finance's failure to disclose its dealer fees; and

k. Whether Service Finance should be subject to punitive or exemplary damages as a result of its failure to disclose its dealer fees and for its other predatory business practices.

98.   The common issues will drive the resolution of the litigation in that their determination will resolve in one stroke issues that are central to the validity of each Class member's claims.

99.   The factual and legal issues identified above (a) remain common to the Class, (b) arise from a common course of conduct and systemic policy decisions made by Defendant, (c) predominate in number and importance over questions that may not be common to the class, and (d) preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class Members.

100.   **Adequacy of Representation— Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict

25

with the interests of the Class Members. Plaintiffs commit to protecting the interests of the Class without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class generally. Plaintiffs have retained attorneys with exceptional experience in complex litigation, including extensive class action experience and experience in handling consumer protection cases. Plaintiffs and their attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class, and Plaintiffs' counsel have ample resources to do so.

101.   **Ascertainably.** The identities of the other Class Members are ascertainable from various sources including Defendant's loan agreements, databases, and other records.

102.   **Predomination.** The common questions of law or fact identified above are substantially similar and predominate over those questions affecting only specific members of the Class.

103.   **Superiority.** The proposed class action is superior to the other means available to the Class to obtain relief.

104.   Defendant has no facially plausible interest in defending against separate, geographically dispersed claims and, in fact, that would be more burdensome to Defendant than defending against all potential claims in a single forum and proceeding.

105.    Likewise, the judicial system has no interest in burdening a number of courts when the claims of this highly cohesive class can be fairly and efficiently concentrated and managed by this Court.

106.    Individualized actions would run the risk of creating inconsistent or contradictory judgments arising from the same set of facts and would increase the likely delay and expense to all parties involved and to the courts, including this Court. By proceeding as a class action, the claims at issue can be managed efficiently through economies of scale.

107.    Ultimately, the class action procedure is superior to other methods of adjudicating Plaintiffs' and the Class Members' claims. This is precisely why class actions exist—class treatment facilitates the fair, uniform, and efficient adjudication of claims, as it would here, and it promotes judicial economy while avoiding the undue financial, administrative, and procedural burdens that necessarily would result from a multiplicity of individual actions.

108.    **Rule 32(b) Injunctive and Declaratory Relief—Fed. R. Civ. P. 23(b)(2).** Defendant acted or refused to act on grounds generally applicable to the Class, making the award of equitable relief and/or restitution appropriate to the Class in their entirety.

109.    **Particular Issues—Fed. R. Civ. P. 23(c)(4).** Any or all of the issues identified above are appropriate for certification pursuant to Rule 23(c)(4) because each is particular and common to the Class and the resolution of each or

all would materially advance the disposition of this action and the parties' interests.

110.   Certification of particular issues would move the litigation forward efficiently, saving money, time, and judicial resources for all involved, regardless of whether the action as a whole might be certified.

**<u>COUNT I: Truth In Lending Act</u>**
**On behalf of the National Class**

111.   Plaintiffs reallege paragraphs 1 through 110 above.

112.   Congress has long prohibited predatory lending practice through the Truth in Lending Act ("TILA"). TILA's purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

113.   To effectuate that purpose, TILA mandates that creditors, like Service Finance, disclose the "amount financed" as part of the consumer credit transaction. 15 U.S.C. § 1638(a)(2)(A). The amount financed is defined as "the amount of credit of which the consumer has actual use," and is calculated by:

> (1) Determining the . . . the cash price (subtracting any downpayment);
> (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and
> (3) Subtracting any prepaid finance charge.

12 C.F.R. § 226.18(b).

28

114.   TILA also requires that creditors separately disclosure any "finance charges." A "finance charge" is defined as "the amount of the finance charge in connection with any consumer credit transaction [and] shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a)

115.   Finance charge is further defined in TILA's implementing regulation (Regulation Z) as "the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4.

116.   Under TILA, when a creditor provides written disclosures and an itemization of the amount financed, it must provide those disclosures prior to the extension of credit. 15 U.S.C. § 1638(b)(1).

117.   Service Finance regularly extends credit, which is payable by agreement in more than four installments and for which a finance charge is imposed. According to the financing agreements signed by all Plaintiffs and all putative Class Members, payments were initially payable directly to Service Finance and not to the solar installer. Accordingly, Service Finance meets the technical definition of a "creditor" under TILA. 15 U.S.C.A. § 1602.

118.     Service Finance's finance agreements with Plaintiffs and the Class did not disclose the finance charge imposed into the loans as the cost of borrowing money from Service Finance.

119.     The failure to disclose the true terms of the cost of borrowing money violates the requirements of 15 U.S.C. § 1638(a)(3). Service Finance also failed to provide any required disclosures prior to extension of credit in violation of § 1638(b)(1).

120.     Defendant's failure to disclose the true cost of financing has caused substantial injuries to Plaintiffs and the Class.

121.     Defendant is liable to Plaintiffs and the Class for actual damages, statutory damages, and attorneys' fees and costs in accordance with 15 U.S.C. § 1640.

122.     Plaintiffs and the Class seek all available monetary, declaratory, and injunctive relief to which they are entitled.

## COUNT II: Fraudulent Inducement
## On behalf of the National Class

123.     Plaintiffs reallege paragraphs 1 through 110 above.

124.     Plaintiffs bring this claim for fraudulent inducement on behalf of the National Class against Service Finance on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements: duty to disclose, breach, reliance, and damages. Alternatively, Plaintiffs bring this claim under the laws of their respective states.

125. In the course of soliciting homeowners to enter financing agreements for solar energy systems, Service Finance relied on fraudulent misrepresentations related to the terms of the financing agreements, and intentionally failed to disclose material facts related to the finance fee included in the financing agreements.

126. Service Finance took great steps to conceal the true cost of the financing fee by instructing its solar partners not to disclose the true cost of solar energy systems, as doing so would allow Plaintiffs and Class Members to deduce the amount of the finance fee.

127. Plaintiffs and Class Members reasonably relied, to their detriment, upon Service Finance's intentional omission of material information regarding the cost of consumer financing.

128. As a result of Service Finance's omissions, Plaintiffs and Class Members were induced to enter into financing agreements with Service Finance, which caused them damages.

129. Defendant's conduct and material omissions were willful and wanton, and in blatant disregard of the rights of Plaintiffs and Class Members, justifying an award of punitive damages.

130. Plaintiffs and the Class seek all available monetary, declaratory, and injunctive relief to which they are entitled.

## COUNT III: Civil Conspiracy
## On behalf of the National Class

131.    Plaintiffs reallege paragraphs 1 through 110 above.

132.    Plaintiffs bring this claim for civil conspiracy on behalf of the National Class against Service Finance on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements: an agreement between two or more individuals to do an unlawful act or a lawful act in an unlawful way, action taken in furtherance of the conspiracy, and damages. Alternatively, Plaintiffs bring this claim under the laws of their respective states.

133.    Service Finance conspired with its solar installer partners to charge undisclosed finance fees and misrepresent the true "Cash Price" of solar energy systems to consumers, including Plaintiffs and the Class, in order to fraudulently induce those class members to purchase and finance solar energy systems.

134.    The objective of the conspiracy—to conceal the finance charge and misrepresent the true "Cash Price" of the solar energy systems—is unlawful in that it constitutes the common law torts of fraud, fraudulent inducement, as well as violations of TILA.

135.    The conspiracy between Service Finance and its solar installer co-conspirators are memorialized in their dealer agreements and the training materials and protocols Service Finance requires its co-conspirators to follow in order to access the Dealer Portal and other online and mobile applications.

136.    Service Finance and its solar installer co-conspirators have performed thousands of overt acts in furtherance of the conspiracy, including by routinely

misrepresenting the Cash Price of solar energy systems when providing financing through Service Finance and its online and mobile applications.

137.    Plaintiffs and the Class have suffered damages as a result of the actions Service Finance and solar installer co-conspirators have taken pursuant to their conspiracy, including by paying undisclosed finance charges.

138.    Plaintiffs and the Class seek all available monetary, declaratory, and injunctive relief to which they are entitled.

<u>**Count III: Florida's Deceptive and Unfair Trade Practices Act**</u>
**On behalf of the National Class**

139.    Plaintiffs reallege paragraphs 1 through 110 above.

140.    Plaintiffs bring this claim for violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.202, et seq. on behalf of themselves and the Class.

141.    FDUTPA protects consumers from those "who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat § 501.202(2). A violation of FDUTPA may be based on "unfair, deceptive, or unconscionable acts or practices." § 501.203(3)(c).

142.    At all relevant times, Plaintiffs and the Class Members were "consumers" as defined by Fla. Stat. § 501.203(7).

143.    At all relevant times, Defendant was and is engaged in "trade or commerce" as defined by Section 501.203 (8).

144.    Defendant engaged in a deceptive and unfair trade practice by:

a. Concealing the existence of the dealer fee in their financing agreements;

b. Conspiring with others, including the solar companies, to conceal the dealer fee;

c. Falsely representing that the proceeds of the loans were going towards the costs of the system and installation when, in fact, the loan was comprised of a significant hidden dealer fee;

d. Misrepresenting that the solar loans were subject to a "low APR" when the APR was artificially reduced by misclassifying the dealer fee as part of the "cash price" of the goods and services;

e. Collecting payments from homeowners before systems were operational and connected to the grid;

f. Training, condoning, and/or encouraging its sales agents to use misleading and deceptive sales tactics to induce homeowners to sign solar agreements;

g. Training, condoning, and/or encouraging its sales agents to falsely represent that solar systems would completely offset their regular electricity bill;

h. Training, condoning, and/or encouraging its sales agents to falsely represent that the ITC and similar tax credits are "rebates" or that they would result in a check being sent to the homeowner;

145.    Service Finance's conduct occurred within and originated from Florida, where Service Finance maintains its headquarters. As a result, FDUTPA applies to all claims brought on behalf of Plaintiffs and the Class.

146.    As a direct and proximate result of Defendant's FDUTPA violations, Plaintiffs and the Class incurred actual damages, including the amount of the undisclosed dealer fees. They are entitled to recoup those damages in this action, along with declaratory and injunctive relief, attorney's fees, and costs.

147.    Plaintiffs seek all available monetary, declaratory, and injunctive relief to which they and the Class are entitled, including all such relief identified in the Prayer for Relief below.

### Count VI: Violation of the Washington Consumer Protection Act
**(Rev. Code Wash §§ 19.86.010, et seq.)**
**On behalf of the Washington Class**

148.    Plaintiffs reallege paragraphs 1 through 110 above.

149.    Service Finance's foregoing business practices constitute false, misleading or deceptive acts or practices under the Washington Deceptive Trade Practices–Consumer Protection Act, Rev. Code Wash. §§ 19.86.010, et seq. ("Washington DTPA"). Accordingly, Plaintiffs Horton, Firch, and Somers bring this count for violation of the Washington DTPA on behalf of themselves and the Washington Class.

150.    Service Finance engaged in deceptive business practices prohibited by the Washington DTPA, including:

a.  Concealing the existence of the dealer fee in their financing agreements;

b.  Conspiring with others, including the solar companies, to conceal the dealer fee;

c.  Falsely representing that the proceeds of the loans were going towards the costs of the system and installation when, in fact, the loan was comprised of a significant hidden dealer fee;

d.  Misrepresenting that the solar loans were subject to a "low APR" when the APR was artificially reduced by misclassifying the dealer fee as part of the "cash price" of the goods and services;

e.  Collecting payments from homeowners before systems were operational and connected to the grid;

f.  Training, condoning, and/or encouraging its sales agents and/or co-conspirators to use misleading and deceptive sales tactics to induce homeowners to sign solar agreements;

g.  Training, condoning, and/or encouraging its sales agents and/or co-conspirators to falsely represent that solar systems would completely offset their regular electricity bill; and

h.  Training, condoning, and/or encouraging its sales agents and/or co-conspirators to falsely represent that the ITC and similar tax credits are "rebates" or that they would result in a check being sent to the homeowner.

151.    Service Finance's conduct in violation of the Washington DTPA occurred in the conduct of trade or commerce.

152.    Service Finance's actions impact the public interest because Plaintiffs and the Washington Class were injured in the exact same way as thousands of others purchasing and financing solar energy systems as a result of Service Finance's generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Service Finance's business.

153.    Plaintiffs and the Washington Class were injured as a result of Service Finance's conduct, including by paying an undisclosed dealer fee and by purchasing systems they would not have otherwise purchased had they been accurately informed as to the true costs and benefits of the systems.

154.    Service Finance's conduct proximately caused injuries to Plaintiffs and the Washington Class.

155.    Service Finance is liable to Plaintiffs and the Washington Class for damages in an amount to be proven at trial including attorneys' fees, costs, and treble damages.

156.    Pursuant to Wash. Rev. Code Ann. § 19.86.095, Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action pursuant to one or more of the proposed Classes, as they may be modified or amended, and respectfully request that this Court:

A.  Determine that the claims alleged herein may be maintained as a class action under Fed. R. Civ. P. 23, and issue an order certifying the Classes as defined above;

B.  Appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

C.  Award damages, including compensatory damages, to Plaintiffs and all other Class Members;

D.  Award Plaintiffs and Class Members actual damages sustained;

E.  Award Plaintiffs and Class Members such additional damages, over and above the amount of their actual damages, which are authorized and warranted by law, including punitive and exemplary damages;

F.  Grant restitution to Plaintiffs and Class Members and require Defendants to disgorge inequitable gains;

G.  Provide all declaratory and equitable relief available, including rescission of contracts entered into between Plaintiffs, the Class Members, and Defendants;

H.  Award Plaintiffs and Class Members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

I.      Award such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted on April 4, 2025, by:

*/s/ Amy L. Judkins*
**Amy L. Judkins, Esq.**
Florida Bar No.: 125046
**Newsome Law, P.A.**
201 S. Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977
Facsimile: (407) 648-5282
ajudkins@newsomelaw.com
lusardi@newsomelaw.com

**Joshua R. Jacobson**
Florida Bar No.: 1002264
**Jacob L. Phillips**
Florida Bar No.: 120130
JACOBSON PHILLIPS PLLC
478 E. Altamonte Dr., Ste. 108-570
Altamonte Springs, FL 32701
Telephone: (407) 720-4057
jacob@jacobsonphillips.com
joshua@jacobsonphillips.com

*Attorneys for Plaintiffs*